UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLEN NELSON,

     Plaintiff,

v.

GRAND TRUNK WESTERN
RAILROAD COMPANY,

     Defendant.

Case No. 18-cv-13393
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21); (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 20); and (3) TERMINATING PLAINTIFF'S MOTION IN LIMINE AS MOOT (ECF No. 23)

Plaintiff Glen Nelson is an engineer for Defendant Grand Trunk Western Railroad Company ("Grand Trunk"). On January 11, 2016, Nelson injured his back as he was attempting to repair a defective air brake hose on a Grand Trunk train that had come to a brief stop during a regularly scheduled trip. In this action, Nelson brings a claim against Grand Trunk under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* (the "FELA"). Nelson alleges, among other things, that he may recover damages from Grand Trunk under FELA because Grand Trunk violated the Federal Safety Appliance Act, 49 U.S.C. § 20302 (the "FSAA") and because that violation caused his injuries. (*See* Am. Compl., ECF No. 9.) The parties have now filed cross-motions for summary judgment. (*See* Mots., ECF Nos. 20, 21.) Nelson has also filed a motion in limine to exclude certain Grand Trunk employees from testifying as expert witnesses. (*See* Mot. in Limine, ECF No.

1

23.)   For the reasons that follow, the Court **GRANTS IN PART** Nelson's motion for summary judgment**, DENIES** Grand Trunk's motion for summary judgment, and **TERMINATES** Nelson's motion in limine as moot.

**I**

The relevant background facts are largely undisputed.  Nelson began working for Grand Trunk as a maintenance worker in 1989. (*See* Nelson Dep. at 12, ECF No. 22-3, PageID.234.)  On January 11, 2016, Nelson was working as an engineer on train number L57361. (*See id.* at 38, PageID.260.)  Train L57361 is a "local puller." (*Id.*)  On January 11th, Train L57361's route began at Grand Trunk's Flat Rock Yard and ended at Ford Yard. (*See id.*; *see also id.* at 99-101, PageID.321-323.)  Train L57361 initially included 11 railcars. (*See id.*)  Railcar CSXT 180589 was located directly behind the locomotive. (*See id.* at 63-65, PageID.285-287.)

Before Train L57361 left the Flat Rock Yard, Nelson inspected the locomotive, and train conductor Thomas Simpson, Jr. (or another Grand Trunk maintenance employee) inspected the railcars. (*See id.* at 45-47, PageID.267-269.)  If the inspections had revealed that something was "wrong" with the locomotive or the railcars, Train L57361 would not have departed the yard. (*Id.* at 47, PageID.269.)  Instead, Nelson and his colleagues "would have sent the [broken] car out or we would have fixed it right there." (*Id.*)  The record does not contain any evidence that Nelson, Simpson, or any other Grand Trunk employee found any problem with the locomotive or railcars before Train L57361 left the Flat Rock Yard.

Train L57361 and its 11 railcars left the Flat Rock Yard at approximately 6:11 p.m. (*See id.* at 48, PageID.270.)  The train thereafter stopped at "Control Point Rodney" in

2

order to pick up 10 additional railcars. (*See id.* at 50, PageID.272.)  These additional cars were located on a sidetrack known as the "Fence Track." (*Id.* at 50-51, PageID.272-273.) When TrainL57361 first arrived at Control Point Rodney, it "dropp[ed]" its original 11 railcars on the "main track at Rodney."[1] (*Id*. at 54, PageID.276; Department of Transportation "Railroad Employee Injury and/or Illness Record" Form, ECF No. 22-5, PageID.567.)  The crew then drove the locomotive to the Fence Track, connected the locomotive to the 10 additional railcars, and returned to the main track in order to reconnect the initial 11 railcars that had been dropped on that track. (*See* Nelson Dep. at 61, ECF No. 22-3, PageID.283.)

Upon returning to the main track, the crew successfully reattached the original 11 railcars to the locomotive. (*See id.*)  However, conductor Simpson discovered a problem with the air brake hose on Railcar CSXT 180589, one of the original 11 railcars from the Flat Rock Yard. (*See id.* at 63, PageID.285.)  The air hose is a part that "allows the air to run through the train from the locomotive through the cars to allow the train to brake, apply

---

[1] Nelson testified that he could not remember if his crew left the original 11 railcars on the "main" track at Control Point Rodney or on another track known as the "industrial" track. (Nelson Dep. at 54-55, ECF No. 22-3, PageID.276-277.)  At the time of the incident, Dean Macki, Grand Trunk's "Assistant Superintendent," completed a Department of Transportation "Railroad Employee Injury and/or Illness Record" form. (*See* ECF No. 22-5, PageID.567-568.)  Macki wrote on that form that the "specific site" where the "accident/incident[] occurred" was the "main track at Rodney." (*Id.*, PageID.567.)  Macki testified that the information that he included on the form came from Grand Trunk employee Jason Sukup. (*See* Macki Dep. at 14, ECF No. 22-5, PageID.533.)  Thus, the information on that form is an admission of a party-opponent and is admissible against Grand Trunk pursuant to Federal Rule of Evidence 801(d)(2).

3

brakes, [and] release [the] brakes.  [I]t's essential to the air brake system throughout the train." (Macki Dep. at 19, ECF No. 22-5, PageID.538.)  Without a working air hose and air brake, the train would not be able to move. (*See* Nelson Dep. at 62, 101, ECF 22-3, PageID.284, 323.)

Simpson determined that the air hose was "broken" and needed to be replaced. (Simpson Statement, ECF No. 22-8, PageID.675; Macki Dep. at 15, ECF No. 22-5, PageID.534; *See also* Nelson Dep. at 67, ECF No. 22-3, PageID.289, describing the "broken" air hose as "defective").[2]  Simpson then radioed Nelson and asked Nelson to bring him a wrench and a replacement air hose. (*See* Nelson Dep. at 65-66, ECF No. 22-3, PageID.287-288.)  Nelson "g[o]t the air hose and the wrench … and [] walked down and gave [them] to [Simpson]." (*Id.* at 66, PageID.288.)  Simpson tried to remove the defective air hose from the railcar, but he could not get the hose to budge. (*See id.* at 76, PageID.298.)

Nelson then tried to remove the air hose. (*See id.*)  Nelson "squatted down" and tugged on the hose to "see if it would move," but it did not. (*Id.* at 78, PageID.300.)  When Nelson tried to remove the hose, he felt "a pain" in his back and "then when [he] stood up [he] had a whole lot of pain" in his back. (*Id.* at 79, PageID.301.)  Nelson said the pain felt like "someone was literally stabbing [him] in the back and turning [it]." (*Id.* at 80, PageID.302.)

---

[2] *See also* Dep. of Kevin Ridenauer, Grand Trunk car inspector, at 20, ECF No. 22-9, PageID.697 (confirming that the air brake hose on Railcar CSXT 180589 was "defective"); Dep. of William Grandberry, Grand Trunk mechanical supervisor, at 16, ECF No. 22-7, PageID.657 (testifying that if an air hose is broken, it is "defective").

Because Simpson and Nelson were unable remove the defective air hose, Simpson called for a "carman" to assist. (*Id.* at 81, 90, PageID.303, 312.)  A carman was dispatched to Control Point Rodney and removed the defective air hose with a blowtorch. (*See id.* at 81-83, PageID.303-305.)  The carman then replaced the defective air hose.  (*See id.* at 99, PageID.321.)  Train L57361 thereafter left Control Point Rodney with its 21 railcars (the original 11 from Flat Rock and the additional 10 that it picked up at Control Point Rodney) and headed toward its final destination at Ford Yard. (*See id.* at 97-98, PageID.319-320.)  Once the train arrived at Ford Yard, Nelson exited the train and was taken to a nearby hospital for evaluation. (*See id.* at 101, PageID.323.)  Nelson says that a result of the injury he suffered on January 11, he continues to suffer from serious and debilitating back pain.

## II

Nelson filed this action against Grand Trunk on October 31, 2018. (*See* Compl., ECF No. 1.)  He thereafter filed an Amended Complaint. (*See* Am. Compl., ECF No. 9.)  In the Amended Complaint, Nelson seeks damages "pursuant to the provisions of" FELA. (*Id.* at ¶1, PageID.29.)  And he alleges that Grand Trunk is liable under FELA because, among other things, Grand Trunk violated the FSAA.[3] (*See id.* at PageID.31.)

The parties filed cross-motions for summary judgment on February 27 and February 28, 2020. (*See* Grand Trunk Mot., ECF No. 20; Nelson Mot., ECF No. 21.)  Nelson also

---

[3] Nelson pleaded Grand Trunk's alleged violation of the FSAA as a separate cause of action. (See Am. Compl., ECF No. 9 at PageID.31.)  But the FSAA "does not purport to confer any right of action upon injured employees." *Urie v. Thompson*, 337 U.S. 163, 189 (1949).  Instead, as described below, a violation of the FSAA establishes the negligence element of a FELA claim.

5

filed a motion to exclude the expert testimony of several of Grand Trunk employees on the basis that Grand Trunk failed to properly disclose the employees as experts. (*See* Mot. in Limine, ECF No. 23.) The Court held a hearing on the summary judgment motions on June 17, 2020, and the Court concludes that it may resolve the motion in limine without a hearing. *See* E.D. Mich. Local Rule 7.1(f)(2).

## III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## IV

### A

The FELA is "a remedial and humanitarian statute ... enacted by Congress to afford relief to employees from injury incurred in the railway industry." *Hardyman v. Norfolk &*

*Western Railway Co.*, 243 F.3d 255, 258 (6th Cir. 2001).   In relevant part, the FELA provides that:

> Every common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.   "In order to present a *prima facie* case under FELA, [a Grand Trunk employee] must prove that: (1) he was injured within the scope of his employment; (2) his employment was in furtherance of Grand Trunk's interstate transportation business; (3) that Grand Trunk was negligent; and (4) that Grand Trunk's negligence played some part in causing the injury for which he seeks compensation under FELA." *Van Gorder v. Grand Trunk Western R.R., Inc.*, 509 F.3d 265, 269 (6th Cir. 2007).

The first two elements of Nelson's FELA claim are not disputed in the cross-motions for summary judgment.   The only elements at issue in those motions are Grand Trunk's alleged negligence and whether the alleged negligence caused Nelson's injury.

## B

The Court begins with the negligence element of Nelson's FELA claim.   Nelson may satisfy that element in one of two ways.   First, he may "prove the traditional common law elements of negligence." *Id.* (quoting *Adams v. CSX Transportation, Inc.*, 899 F.2d 536, 539 (6th Cir. 1990)). Second, he may prove that Grand Trunk violated the FSAA.   In fact, "a violation of the [FSAA], without more, is sufficient to establish employer

7

negligence under FELA." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 351 (6th Cir. 2002). *See also Marshall v. Grand Trunk Western R.R. Co.*, 850 F.Supp.2d 686, 696 (W.D. Mich. 2011) (explaining that a plaintiff "may establish the third element of FELA liability— negligence—as a matter of law if he proves that the railroad company violated [the FSAA]").

## 1

Nelson argues that he has established Grand Trunk's negligence as a matter of law by proving that Grand Trunk violated the FSAA. The Court agrees.

"The FSAA imposes an absolute duty on railroads to provide and maintain certain safety appliances, including power braking systems." *Richards v. Consolidated Rail Corp.*, 330 F.3d 428, 432 (6th Cir. 2003). To prove a violation of the FSAA, a plaintiff must establish that an appliance within the scope of the Act "fail[ed] to function, when operated with due care, in the normal, nature and usual manner." *Myers v. Reading Co.,* 331 U.S. 477, 483 (1947). In addition, the plaintiff must show that the train or railcar was "in use" at the time of the injury. *Rogers v. Norfolk Southern Ry. Co.*, 126 F. App'x 694, 696 (6th Cir. 2005). Indeed, "[it] has long been established that the provisions of FSAA only apply to trains and railcars that are actually 'in use.'" *Id.* (quoting *Brady v. Terminal R.R. Ass'n*, 303 U.S. 10, 13 (1938)). "The determination of when a train or railcar is 'in use' under the

FSAA is a question of law for the court."[4] *Rogers v. Norfolk Southern Ry.Co.*, 2015 WL 4191147, at *3 (N.D. Ohio July 10, 2015).

Here, the parties do not dispute that the air brake hose at issue (1) is a train appliance that comes within the scope of the FSSA and (2) was defective. Thus, the only live dispute with respect to whether Grand Trunk violated the FSAA is whether Train L57361 was "in use" at the time Nelson suffered his back injury. Nelson asserts that the train was in use; Grand Trunk insists that it was not. The Court agrees with Nelson.

"Determining whether a locomotive is 'in use' is not always a fairly straightforward exercise." *Stierwalt v. CSX Transportation, Inc.*, 2007 WL 3046456, at *4 (N.D. Ohio Oct. 16, 2007) (internal quotation marks omitted). "To be sure, a locomotive pulling a train on a main line is 'in use,' and a locomotive in a repair shop for servicing is not 'in use.'" *Id.* But, where, as here, "a locomotive is in transition from one status to another[, t]here is no bright line separating 'use' from 'non-use.'" *Id.* While the Sixth Circuit has decided a number of cases involving the "in use" provision of the FSAA, that court has not yet established a "methodology" to guide the "in use" analysis. *Rogers*, 2015 WL 4191147, at *3. *See also Hinkle v. Norfolk Southern Ry. Co.*, 2006 WL 3783521, at *3 (S.D. Ohio. Dec. 21, 2006) (observing that "the Sixth Circuit has not addressed what the correct 'in use' analysis is, [and] there is no controlling 'in use' decision.")

---

[4] At the hearing on the summary judgment motions, counsel for both parties agreed that there were no questions of fact that needed to be resolved by a jury before the Court could rule on the "in use" dispute.

District courts in this Circuit have applied a "totality-of-the-circumstances" test to determine whether a train is "in use." *Hinkle*, 2006 WL 3783521, at *3. "Under this approach, "the primary factors [considered] are where the train was located at the time of the accident and the activity of the injured party." *Id.* The Court joins the other district courts in this Circuit that have applied the totality-of-the-circumstances approach.

Under that test, Train L57361 was "in use" at the time of Nelson's injury. As described above, when Nelson injured his back, Train L57361 had passed its pre-departure inspection, left the Flat Rock Yard on its regularly scheduled route, connected with an additional 10 railcars at Control Point Rodney, and was preparing to continue on its journey to its final destination at Ford Yard. In addition, when Nelson suffered his back injury, Train L57361 was located on the "main" track at Control Point Rodney.[5] Moreover, at the moment of injury, Nelson was working in his role as engineer, trying to prepare Train L57361 to continue on its regularly scheduled journey as soon as the repair was made. Simply put, Nelson's injury occurred during a brief stop in the middle of Train L57361's regularly scheduled trip from the Flat Rock Yard to the Ford Yard. Under these circumstances, Train L57361 was "in use" at the time Nelson injured back.

---

[5] As explained in footnote one above, Nelson could not remember whether Train L57361 was located on the "main" track at Control Point Rodney or if it was located on the "industrial" track. However, Grand Trunk's employees, and the "Railroad Employee Injury and/or Illness Record" form completed after the accident by Grand Trunk Assistant Superintendent Dean Mackie, confirmed that Nelson was injured while trying to repair the defective air brake hose on the "main track at Rodney." (ECF No. 22-5, PageID.567.)

Under similar – though admittedly not identical – circumstances, a district court in this Circuit reached the same conclusion. In *Stierwalt*, *supra*, the "plaintiff was assigned by defendant to work as a conductor on a crew transporting train Q377 from Crestline, Ohio, to Indianapolis, Indiana." *Stierwalt*, 2007 WL 3046456, at *1. "While en route to Crestline, the lead locomotive encountered a problem." *Id.* The plaintiff informed the defendant of the defect, and defendant instructed plaintiff to stop at the Marion Equipment Depot so that plaintiff's crew could "switch out the lead locomotive for the third locomotive in their four locomotive consist." *Id.* "The train proceeded to Marion. On arrival, [the plaintiff] dismounted the lead locomotive to assist with separating the third and fourth units to replace the lead unit. She was injured when, on being startled by a blast of air from a pressurized air hose, she fell backwards on the ballast." *Id.* at *2. She later sued the defendant under the Locomotive Inspection Act (the "LIA"), which "imposes strict liability on railroad carriers for violations of its safety standards."[6] *Id.* at *3. On summary judgment, the court concluded that the train was "in use" at the time the plaintiff suffered her back injury:

---

[6] As counsel for Grand Trunk acknowledged at the hearing on the summary judgment motions, the LIA is a precursor to the FSAA and is instructive when determining whether a train is "in use" under that statute. *See*, *e.g.*, *Bearfield v. Soo Line Railroad Co.*, 2008 WL 268587, at *3 n.2 (D. N.D. Jan. 29, 2008) ("The 'in use' language in the FSAA is identical to the language in the LIA, and the courts have applied case law interchangeably"); *Underhill v. CSX Transp., Inc.*, 2006 WL 1128619, at *2 (N.D. Ind. Apr. 24, 2006) ("When determining whether a vehicle was in use [under the FSAA], courts often look to interpretation of an identical 'in use' requirement in a similar statute, the Federal Boiler Inspection Act, which was recodified in 1994 as the Locomotive Inspection Act, at 49 U.S.C. § 20701").

> Not having found a case involving a locomotive that has broken down while underway and been moved to a point at which it was to be set out for repair, I conclude that the locomotive in this case was "in use" under the LIA. It had been released for, and had been in service until the breakdown. *Cf. Trinidad v. Southern Pac. Transp. Co.,* 949 F.2d 187, 189 (5th Cir.1991) (where locomotive has not completed inspection, it is not "in use"). Though not itself running, it remained coupled to a train that was headed for its final destination, and would continue toward that destination once the inoperable locomotive was set out.
>
> The LIA is a safety measure and the ultimate goal is to protect railroad workers from injury and death. *Matson v. Burlington N.Santa Fe R.R.,* 240 F.3d 1233, 1235 (10th Cir.2001). Remedial statutes are to be construed liberally to fulfill their purposes, *see Lilly v. Grand Trunk Western R.R. Co.,* 317 U.S. 481, 486 (1943), and this can best be accomplished by finding that the locomotive in this case was in use at the time of plaintiff's accident. Accordingly, I find that the LIA is applicable to the instant case.

*Id.* at ** 4-5.  As in *Stierwalt,* Train L57361 here "had been released for, and had been in service until the breakdown." *Id.* at *4.  And, it "continue[d] toward [its final] destination once the inoperable" air brake hose was replaced. *Id.*  Thus, Train L57361 was "in use" at the time of Nelson's back injury.

For all of these reasons, Nelson has established that Grand Trunk violated the FSAA.  He has therefore satisfied the negligence requirement of his FELA claim.

### 2

Grand Trunk counters that two published Sixth Circuit decisions – *Sherry v. Baltimore & O.R. Co.*, 30 F.2d 487 (6th Cir. 1929) and *Erskine v. Consolidated Rail Corp.*, 814 F.2d 266 (6th Cir. 1987) – compel the conclusion that Train L57361 was not "in use"

when Nelson suffered his back injury.  The Court disagrees with Grand Trunk's contention that those decisions control here.

In *Sherry*, a defective railcar "had been placed upon one of the ladder tracks in the general yard, cut from the train, and reported to plaintiff as having a defective brake." *Sherry*, 30 F.2d at 488.  The plaintiff, an inspector and repairman, "went to the car, found that it had a badly bent brake staff, and, in order to determine whether the brake was operative notwithstanding this defect, mounted to the top of the car and attempted to apply the brake." *Id.*  When the plaintiff mounted the top of the car, "the brake staff broke, throwing him from the car." *Id.*  Plaintiff suffered injuries and alleged that his employer violated the FSAA. The district court dismissed plaintiff's complaint and the Sixth Circuit affirmed.  The Sixth Circuit concluded that the railcar was not "in use within the meaning of the [FSAA]":

> In the instant case the defective car was not being hauled or used by the defendant, except in that it was stored temporarily upon one of the ladder tracks. It had been withdrawn from use for the very purpose of undergoing repair. No movement was immediately contemplated, and no action of setting the brakes was necessary, save as incident to inspection and repair. In Chicago G.W.R.R. Co. v. Schendel, cited supra in the note, the car was being placed upon a siding for the purpose of withdrawing it from use, but the Supreme Court specifically states that the use, movement, or hauling of the defective car, within the meaning of the statute, had not ended at the time of the accident. In Texas & Pacific Ry. v. Rigsby, 241 U.S. 33, 42, 36 S.Ct. 482, 60 L.Ed. 874, the Supreme Court also refers to the question of use, and, as pointed out in the McCalmont Case (page 739), this decision must be interpreted as based upon the theory that the taking of 'bad order' cars to the shops for repair is a 'part of the unitary journey of the car from the point of first discovery to the precise point of actual repair,' and therefore within the provision for continuance of civil

13

> liability under 45 U.S.C. § 13 (45 USCA § 13). In none of the cases cited was liability held to attach after withdrawal from service had been completed and during the course of repair.
>
> [….]
>
> The defectively equipped car not having been in use within the meaning of the Safety Appliance Act, at the time of injury to the plaintiff, the verdict was properly directed for the defendant, and the judgment rendered thereon is affirmed.

*Id.* at 489.   Grand Trunk says that "[t]his case falls squarely into the Sixth Circuit's reasoning in *Sherry* because [Railcar] CSXT 180589 had effectively been 'withdrawn from use for the very purpose of undergoing repair. No movement was immediately contemplated, and no action of setting the brakes was necessary, save as incident to inspection and repair.'" (Grand Trunk Mot., ECF No. 20, PageID.97, quoting *Sherry*, 30 F.2d at 489.)  The Court disagrees.

Sherry is materially distinguishable from this case.  In *Sherry*, the defective railcar was moved for repair from the main line to a side "ladder track," "no movement was immediately contemplated," and the plaintiff who was injured was a repairman whose job it was to repair the broken car.  Here, in sharp contrast, Train L57361 was on the "main line at Rodney" and had not been "cut from the train" nor taken to a sidetrack for repair. Moreover, movement of Train L57361 *was* "immediately contemplated" at the time of Nelson's injury.  Indeed, the whole point of the repair that Nelson was attempting to make was to enable the train to resume its trip to Ford Yard as soon as possible – and the train in fact promptly resumed its journey once the repair was complete.  For these reasons, *Sherry* does not control.

14

In *Erskine*, the plaintiff was "was working on a caboose with an angle cock that was allegedly defective. Later that day, in preparation for a switching operation, plaintiff attempted to release the air in the brake system by turning the angle cock. He testified that, because the angle cock was stiff, he had to use excessive force to loosen it. Consequently, the air was released too quickly, and plaintiff could not control the air hose attached to the angle cock. The metal end of the hose hit him in the jaw, causing extensive injury." *Erskine*, 814 F.2d at 267.  The plaintiff subsequently filed a personal injury suit under the FELA and attempted to establish the railroad's negligence by proving a violation of the FSAA. *See id.*  At trial, the district court "refused to submit plaintiff's claim under the [FSAA] to the jury because it found that the type of accident in which plaintiff was injured is not encompassed by the Act." *Id.* at 268-69.  The Sixth Circuit affirmed.  It held that because the train was involved in a switching operation, and was not moving at the time of plaintiff's injury, the train was not "in use" pursuant to the FSAA:

> In the present case, the district court concluded that the [FSAA] was inapplicable because the air brake provisions only cover train movements and not switching movements. The uncontroverted evidence produced at trial established that the locomotive was not attached to the train at the time of plaintiff's injury and thus a switching movement was involved.
>
> The district court's opinion is entirely consistent with the Supreme Court's interpretation of the air brake provisions. The Court has considered the provisions on several occasions, and each time the Court recognized that the air brake provisions are designed to cover defects which prevent the brakes from effectively controlling movement of the train. The Court has noted that
>
> > History showed that hundreds of workers had been injured or killed by the stopping of unbraked cars, by

the operation of hand brakes, and by the use of hand couplers. This history, well known to Congress, was the primary purpose behind the legislation.

*United States v. Seaboard Air Line R.R.,* 361 U.S. 78, 82–83, 80 S.Ct. 12, 15–16, 4 L.Ed.2d 25 (1959) (footnote omitted).

In *United States v. Erie R.R.,* 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019 (1915), the Court held that switching operations are not covered by the Act. *Id.* at 408, 35 S.Ct. at 624. However, the movement of trains over mainline tracks is within the purview of the Act because in the course of such movements the trains are "exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements." *Id.* at 408, 35 S.Ct. at 624.

[….]

Subsequent decisions have emphasized that the Act applies only when the train is engaged in movement as a train. *See Louisville & Jeffersonville Bridge Co. v. United States,* 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757 (1919); *United States v. Seaboard Air Line R.R.,* 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959). "A moving locomotive with cars attached is without the [brake] provision of the act only when it is *not* a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains." *United States v. Northern Pacific Ry.,* 254 U.S. 251, 254–55, 41 S.Ct. 101, 102, 65 L.Ed. 249 (1920) (emphasis in original).

[….]

Once again, the violation existed because the brakes failed to effectively control the motion of the train. *See Kraemer v. Chicago & N.W. Ry.,* 148 Minn. 310, 181 N.W. 847 (1921) (plaintiff relieved from burden of establishing negligence when decedent's death occurred in the course of a train movement and as a result of the failure of the air brakes to control the movement of the train); *La Mere v. Railway Transfer Co.,* 125 Minn. 159, 145 N.W. 1068 (1914) (employee relieved from burden of establishing

> negligence when injury was caused by violation of the
> [FSAA]).

[….]

> The clear import of these decisions is that the Act applies only
> to train movements and that it was designed to insure that trains
> stop effectively. We agree with the district court that the
> [FSAA] does not apply to the instant case. The uncontroverted
> evidence establishes that the train was involved in a switching
> movement when the injury occurred. Moreover, the injury did
> not result from a failure of the air brakes to effectively control
> the movement of the train. Accordingly, we conclude that the
> district court did not err in directing a verdict on this issue.

*Id.* at 269-270.  *Grand Trunk* insists that "the *Erskine* Court held that the FSAA applies

only to train movements," and it says that because Train L57361 was not moving (and no

"movement [was] imminent"), Nelson cannot possibly prove a violation of the FSAA.

(Grand Trunk Mot., ECF No. 20, PageID.98.)

Grand Trunk's argument is a serious one, and its reliance on *Erskine* is

understandable.  *Erskine* does state that the FSAA "applies only to train movements," and

that the Act applies to injuries caused by defective air brakes only where the injury

"result[s] from the failure of the air brakes to effectively *control the movement of the train*."

*Erskine*, 814 F.2d at 270 (emphasis added).  And other district courts have likewise read

*Erksine* to hold that the FSAA applies to an injury caused by air defective brakes only

where the train was moving at the time of the injury. *See Allen v. Soo Line R. Co.*, 2001

WL 1222183, at *4 (S.D. Ind. Apr. 4, 2011) (citing *Erskine* for the proposition that "the

statutory reach of the air brake provision – the ability of the locomotive engineer to control

the speed or movement of the train – is not implicated when a train is safely stopped and

17

not in motion"); *McGowan v. Wisconsin Central Ltd.*, 2005 WL 2077355, at *5 (E.D. Wis. Aug. 26, 2005) ("Interpreted broadly, *Erskine* holds that the [FSAA] is inapplicable if … the plaintiff's injury did not result from a failure of the air brakes to effectively control the movement of the train.").

But the Court concludes that *Erskine* does not control here for two reasons.  First, to the extent that *Erskine* holds that a train must be moving in order to be "in use" or that a plaintiff must show that his injury "result[ed] from the failure of the air brakes *to effectively control the movement of the train*," *Erskine* squarely conflicts with the United States Supreme Court's decision in *Brady*, *supra*.  In *Brady*, the plaintiff was injured when he was inspecting cars on a receiving track, and he sought damages under the FSAA.  "The first question" the Supreme Court confronted was "whether the car can be said to have been in use by the respondent at the time in question." *Brady*, 303 U.S. at 13.  Even though the car was not moving at the time of plaintiff's injury, the Supreme Court nonetheless held that the car was "in use":

> The 'use, movement or hauling of the defective car,' within the meaning of the statute, had not ended when petitioner sustained his injuries. The car had been brought into the yard at Granite City and placed on a receiving track temporarily pending the continuance of transportation. If not found to be defective, it would proceed to destination; if found defective, it would be subject to removal for repairs. It is not a case where a defective car has reached a place of repair. The car in this instance had not been withdrawn from use. *The car was still in use, though motionless.* In view of that use, either the Terminal Association or the Wabash was subject to the obligation imposed by the statute.

*Id.* (emphasis added; internal citations omitted). Because *Brady* squarely holds that a train may be "in use" under the FSAA even "though motionless," this Court may not follow the statement in *Erskine* that a train is "in use" only when moving.[7]

Second, *Erskine* is distinguishable on its facts. The train in *Erskine* was involved in a "switching operation." During a "switching operation," a crew "classif[ies] and assembl[es] cars within railroad yards for the purpose of making up trains." *Erskine*, 814 F.2d at 270. Here, as counsel for Grand Trunk conceded during the hearing on the summary judgment motions, Train L57361 was not involved in a "switching operation" at the time of Nelson's injury. Instead, at the time of Nelson's injury, Train L57361 was in the middle of its scheduled route and was set to resume movement as soon as reasonably possible after the defective air brake hose was repaired. Given these key differences between *Erskine* and this case, *Erskine* does not control here.

For all of these reasons, neither *Sherry* nor *Erskine* alters the Court's conclusion that Grand Trunk violated the FSAA.[8] And because Nelson has proved that Grand Trunk

---

[7] Importantly, there is no indication in *Erskine* that the parties informed the Court about *Brady*. The Sixth Circuit did not attempt to reconcile *Brady* with its interpretation of the "in use" requirement. Thus, *Erskine* is not binding on this Court as an authoritative interpretation of *Brady*.

[8] Grand Trunk also cites *Steer v. Burlington Northern, Inc.*, 720 F.2d 975 (8th Cir. 1983), and *Phillips v. CSX Transp. Inc.*, 190 F.2d 285 (4th Cir. 1999), in support of its contention that Train L57361 was not "in use" at the time of Nelson's injury. But both of those decisions are materially distinguishable. In *Steer*, the court held that a locomotive was not "in use" where, at the time of the plaintiff's injury, it "had been taken to the 'Asparagus Patch,' a place for removal of locomotives and their repair." *Id.* Here, as explained in detail above, Train L57361 was in the middle of its scheduled route and on a main track at the time of Nelson's injury. In *Phillips*, the court concluded that the train was not "in use" at the time of the plaintiff's injury

violated the FSAA, he has established the negligence element of his FELA claim as a matter of law.

## C

The Court next turns to the causation element of Nelson's FELA claim.  Nelson does not focus much on this element in his motion.  Near the end of the motion, Nelson argues that "[i]t is clear from the depositions of the Plaintiff, the depositions of [Grand Trunk's employees], and the exhibits of the defective air brake hose at issue on Car CSXT 180589, that … [Grand Trunk's violation of the FSAA] caused, in whole or in part, [Nelson's] injuries." (Nelson Mot., ECF No. 21, PageID.195-196.)  But there is at least some indication in the record that Nelson had a pre-existing back injury at the time of the incident in question here (*see* independent medical examination report, ECF No. 22-11), and the Court is not yet persuaded that Nelson has established *as a matter of law* that the incident here caused his claimed injuries.  Accordingly, the causation element of Nelson's FELA claim must be submitted to a jury.

---

because the injury occurred "at the end of the switching process."  But, again, Nelson's injury here occurred mid-route, not during a switching maneuver.  Thus, *Phillips* is inapplicable. Finally, Grand Trunk argues that in *LeDure v. Union Pacific R.R. Co.*, --- F.3d ---, 2020 WL 3263897 (7th Cir. June 17, 2020), the Seventh Circuit recently recognized that "that a piece of equipment is clearly not 'in use' when it is undergoing repair." (Grand Trunk Supp. Br., ECF No. 35, PageID.1358.)  But the facts of *LeDure* are unlike those here.  In *LeDure*, when the plaintiff was injured, the train at issue was "on a sidetrack" and was not in the midst of a regularly scheduled trip. *LeDure*, 2020 WL 3263897, at *1.  *LeDure* therefore says little about how the Court should resolve this case.

## V

Finally, the Court addresses Nelson's motion in limine to exclude Grand Trunk from calling certain of its employees as expert witnesses at trial. (*See* Mot. in Limine, ECF No. 23.)  In that motion, Nelson argues that Grand Trunk did not properly and timely disclose that it would be calling the identified employees as experts. (*See id.*)

Grand Trunk seeks to call these witnesses "to offer opinion testimony regarding the operation of the airbrake system on trains and train cars, the inspection of the same, the repair options that were available to Mr. Nelson and Mr. Simpson on the night of the alleged incident, the CN Life Rules, and his understanding of the same." (Expert Disclosures, ECF No. 24-5, PageID.891-92.)   But opinion testimony regarding the operation of the airbrake system and the repair options available to Nelson are not relevant to the issues that will be presented at trial.[9]  Accordingly, the Court will terminate Nelson's motion in limine as moot.

## VI

For all of the reasons stated above, **IT IS HEREBY ORDERED** that:

- Nelson's motion for summary judgment (ECF No. 21) is **GRANTED IN PART**.
  Nelson has established that he is entitled to judgment as matter of law in his favor

---

[9] Since Nelson has established that Grand Trunk violated the FSAA, his alleged contributory negligence – in failing to use an alternative means of repair – is irrelevant. *See Urie*, 337 U.S. at 188 (explaining the FELA "bar[s] pleadings of, respectively, contributory negligence and assumption of risk in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee") (internal quotation marks omitted).

on the negligence element of his FELA claim.  The motion is **DENIED** in all other respects;

- Nelson's motion in limine (ECF No. 23) is **TERMINATED AS MOOT**; and

- Grand Trunk's motion for summary judgment (ECF No. 20) is **DENIED**.

This action will be set for trial on all of the elements of Nelson's FELA claim other than negligence and on the question of damages.  Prior to the trial, the Court will refer this action for a settlement conference with the assigned Magistrate Judge.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 25, 2020


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 25, 2020, by electronic means and/or ordinary mail.

s/ Holly A. Monda
Case Manager
(810) 341-9764
